IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FREDERICK TANNER,<br><br>                       Petitioner,<br><br>      vs.<br><br>DANIEL E. CUEVA, Acting Warden, California Medical Center,[1]<br><br>                       Respondent. | No. 2:16-cv-00581-JKS<br><br>MEMORANDUM DECISION |

       Frederick Tanner, a state prisoner now represented by counsel, filed a Petition for a Writ of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254. Tanner is in the custody of the California Department of Corrections and Rehabilitation and incarcerated at California Medical Center. Respondent has answered, and Tanner has replied.

I. BACKGROUND/PRIOR PROCEEDINGS

       On direct appeal of Tanner's conviction, the California Court of Appeal laid out the following facts underlying this case:

> At about 10:45 a.m. on January 19, 2013, Eisar Askari and Sokung Swing were preparing to open the restaurant where they worked. As Askari came into the restaurant after dumping the fryer oil, he heard someone in the office. When he opened the office door, he saw [Tanner] inside with Swing's purse in one hand and a "bunch of . . . cash" in the other. When asked why he was there, [Tanner] responded that he wanted to use the restroom. Askari then asked why [Tanner] had Swing's purse; [Tanner] responded by dropping the purse and punching Askari in the face. [Tanner] continued hitting at Askari, and Askari implored Swing to call 911, which she did.
> 
> Askari told [Tanner] to leave, but [Tanner] continued punching Askari until he was pinned against a wall of the office, leaving a hole in the sheetrock the size of Askari's head. It appeared [Tanner] was attempting to reach for scissors or a knife on top

---

[1]     Daniel E. Cueva, Acting Warden, California Medical Center, is substituted for Stu Sherman, Warden, Substance Abuse Treatment Facility and State Prison, Corcoran. FED. R. CIV. P. 25(c).

of the desk in the office, so Askari tried to hold [Tanner's] hands away.  In the meantime, [Tanner] kept hitting Askari in the head and kneeing him in the legs.

Askari and [Tanner] fell through the open office door and landed on the ground with [Tanner] on top of Askari.  Swing then went to the neighboring business to ask for help.  [Tanner], sitting on Askari's midsection, then "grabbed [Askari's] head and smashed [it] like six, seven times . . . on the ground" until Askari "passed out."  While [Tanner] was hitting Askari's head against the ground, [Tanner] repeated "I'm going to kill you" two or three times before Askari "blacked out."  Askari was scared and believed [Tanner] would kill him.

When Swing returned, [Tanner] was on top of Askari, who appeared to be unconscious, was not moving, and whose eyes were "bulged out."  [Tanner's] hands were around Askari's neck.  Swing pulled [Tanner] off Askari, pushed him to the ground, and tried to restrain him.  As she did, police officers and men from the neighboring business arrived.  Askari testified he woke as [Tanner] was being placed into handcuffs.  Officers testified Askari was conscious and holding [Tanner] on the ground when they entered.

An officer helped Askari into a chair, gave him water, and he began vomiting repeatedly.  The officer questioned Askari, who she described as being excited, having watery eyes, animated, and "pretty upset."  Another officer described Askari's demeanor as "visibly upset and scared."  The owner of the neighboring business also testified that Askari "appeared scared" when he arrived.  Later, after [Tanner] had been placed in the patrol car, Askari told him to "go get a job."  Askari only worked part of his shift that day, leaving early because he was "shaking" and "still scared."

When the other officer searched [Tanner], he was in possession of a wallet belonging to yet another victim.  The other victim had left his wallet, which had approximately $200 cash inside, on the front seat of his car at a car wash a few blocks from the scene of the burglary.  When he received a telephone call from the police about a half hour later, he discovered that the wallet was missing.  Officers returned the wallet, and all the money, to the victim.

Following a bifurcated trial, the jury found [Tanner] guilty of burglary ([Cal.] Pen. Code, § 459—count one),1 simple battery (§ 242 [a lesser offense for count two, which was charged as battery resulting in the infliction of serious bodily injury on a person (§ 243, subd. (d))]), assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(4)—count three), criminal threats (§ 422—count four), and receiving stolen property (§ 496, subd. (a)—count five).  The jury found not true the special allegation that [Tanner] had inflicted serious bodily injury during the commission of the assault, and found [Tanner] not guilty of the charged battery causing serious bodily injury.  The jury then found true that [Tanner] had two prior convictions (§§ 667, 1170.12) and had served five prior prison terms (§ 667.5, subd. (b)).

The court found the two prior convictions were strikes and that the current conviction for criminal threats was also a strike.  The trial court sentenced [Tanner] to an indeterminate term of 25 years to life for criminal threats and a consecutive determinate term of 21 years four months, comprised of six years for burglary, one year four months for receiving stolen property, a stayed term of three years for assault, two five-year terms for prior convictions, and four one-year terms for prior prison terms.

2

*People v. Tanner*, No. C076627, 2015 WL 6468549, at *1-2 (Cal. Ct. App. Oct. 27. 2015).

Through counsel, Tanner appealed his conviction, arguing that: 1) there was insufficient evidence to support the conviction; 2) the trial court erred in excluding evidence and limiting cross-examination, and his counsel was ineffective for failing to object to the exclusion and limitation; 3) the prosecutor committed misconduct, and defense counsel was ineffective for failing to object; 4) those errors were cumulatively prejudicial; and 5) the trial court erred in failing to stay punishment on a burglary conviction because it arose from the same course of conduct as the criminal threats and was motivated by the same intent and purpose. The Court of Appeal unanimously affirmed the judgment against Tanner in a reasoned, unpublished opinion issued on October 27, 2015. *Tanner*, 2015 WL 6468549, at *8. Tanner petitioned for review in the California Supreme Court, which was denied without comment on January 27, 2016.

Tanner then timely filed a *pro se* Petition for a Writ of Habeas Corpus in this Court on March 16, 2016. Docket No. 1; *see* 28 U.S.C. § 2244(d)(1),(2). In his initial petition, Tanner attached his opening brief filed on direct appeal, and asked this Court to review the claims raised within. Docket No. 1 at 15. Respondent moved to dismiss the petition on the ground that three of the claims were raised on direct appeal to the California Court of Appeal, but were not included in the petition for review filed in the California Supreme Court, and were thus unexhausted. Docket No. 14. Tanner moved for a stay and abeyance to pursue exhaustion in the state courts, Docket No. 21, and filed in the California Supreme Court a *pro se* petition for habeas relief dated September 22, 2016. While the stay motion was pending in this Court, the California Supreme Court summarily denied the habeas petition on November 9, 2016. This

Court thereafter denied the stay motion as moot and ordered Respondent to answer the exhausted claims in the Petition. Docket No. 29.

In response, Respondent renewed his motion to dismiss three grounds as unexhausted. Docket No. 36. The Court then granted Tanner's motion for the appointment of counsel, Docket No. 37, and appointed counsel opposed the motion to dismiss, Docket No. 44. In the opposition, Tanner voluntarily withdrew his fifth claim (regarding the trial court's alleged error in failing to stay punishment for his burglary conviction), but argued that the other two claims had been properly exhausted. Docket No. 44 at 4. This Court, through a previously-assigned magistrate judge, found that certain of Tanner's claims were exhausted, and ordered counsel to file an Amended Petition. Docket Nos. 50, 52. Counsel filed a First Amended Petition ("Petition"), Docket No. 59, which has now been fully briefed and is before the undersigned judge for adjudication.

## II. GROUNDS/CLAIMS

In his counseled Petition before this Court, Tanner argues that: 1) there was insufficient evidence to sustain his conviction for criminal threats; and 2) trial counsel was ineffective for failing to object to the trial court's erroneous exclusion of evidence and limitation of cross-examination.

## III. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2). A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision." *Id.* at 412. The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts. *Early v. Packer*, 537 U.S. 3, 10 (2002). Where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding. *See Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied). It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)). A summary denial is an adjudication on the merits and entitled to deference. *Harrington v. Richter*, 562 U.S. 86, 99 (2011). Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

## IV. DISCUSSION

Ground 1.        Sufficiency of the Evidence

Tanner first argues that the prosecution presented legally insufficient evidence to sustain Tanner's conviction for criminal threats because the evidence did not show that Askari was in "sustained fear," a required element of a criminal threats conviction. According to Tanner, there was insufficient evidence to support the necessary finding that Askari was in sustained fear because Askari lost consciousness either while or immediately after the threats were issued, and there was no evidence that Askari was still afraid when he regained consciousness.

As articulated by the Supreme Court in *Jackson*, the federal constitutional standard for sufficiency of the evidence is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in the original); *see McDaniel v. Brown*, 558 U.S. 120, 132-33 (2010) (reaffirming this standard). This Court must therefore determine whether the California court unreasonably applied *Jackson*. In making this determination, this Court may not usurp the role of the finder of fact by considering

6

how it would have resolved any conflicts in the evidence, made the inferences, or considered the evidence at trial. *Jackson*, 443 U.S. at 318-19. Rather, when "faced with a record of historical facts that supports conflicting inferences," this Court "must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and defer to that resolution." *Id.* at 326.

It is a fundamental precept of dual federalism that the States possess primary authority for defining and enforcing the criminal law. *See Engle v. Isaac*, 456 U.S. 107, 128 (1982). Consequently, although the sufficiency of the evidence review by this Court is grounded in the Fourteenth Amendment, it must take its inquiry by reference to the elements of the crime as set forth in state law. *Jackson*, 443 U.S. at 324 n.16. A fundamental principle of our federal system is "that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *see West v. AT&T*, 311 U.S. 223, 236 (1940) ("[T]he highest court of the state is the final arbiter of what is state law. When it has spoken, its pronouncement is to be accepted by federal courts as defining state law . . . ."). "Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension." *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 345 (2006) (quoting *Smith v. Philips*, 455 U.S. 209, 221 (1982)) (internal quotation marks omitted).

Under *Jackson*, this Court's role is simply to determine whether there is any evidence, if accepted as credible by the trier of fact, sufficient to sustain conviction. *Schlup v. Delo*, 513 U.S. 298, 330 (1995). The United States Supreme Court has recently even further limited a federal court's scope of review under *Jackson*, holding that "a reviewing court may set aside the

7

jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (per curiam). *Jackson* "makes clear that it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial." *Id*. Under *Cavazos*, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" *Id.* (quoting *Renico v. Lett*, 559 U.S. 766, 773 (2010)).

The Court of Appeal considered and rejected Tanner's insufficiency of the evidence claims on direct appeal as follows:

> When a defendant contends there is insufficient evidence to support his conviction, we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence, i.e., evidence that is reasonable, credible, and of solid value, based upon which a reasonable trier of fact could find defendant guilty beyond a reasonable doubt. (*People v. Osband* (1996) 13 Cal.4th 622, 690.) We accord due deference to the verdict and will not substitute our conclusions for those of the trier of fact. (*People v. Koontz* (2002) 27 Cal.4th 1041, 1078.) Nor will we reverse the conviction unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]." (*People v. Redmond* (1969) 71 Cal.2d 745, 755.)
> To prove a criminal threat, among other things, the People must show "that the threat actually caused the person threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's safety . . . .'" (*People v. Toledo* (2001) 26 Cal.4th 221, 227–228.) For purposes of this inquiry, fear is sustained if there is "evidence that the victim's fear is more than fleeting, momentary or transitory." (*People v. Culbert* (2013) 218 Cal.App.4th 184, 190 (*Culbert*).) Even if the encounter lasts only a minute, if the victim in that situation believes his or her death is imminent, he or she suffers sustained fear. (*Id.* at pp. 190–191, citing *People v. Fierro* (2010) 180 Cal. App. 4th 1342, 1349.)
> [Tanner], citing *In re Ricky T.* (2001) 87 Cal. App. 4th 1132, argues that because Askari's fear "did not last 'beyond the moments of the encounter,'" his fear was not sustained. We find Ricky T. involves a sui generis factual situation and is inapposite. Ricky T. found himself locked out of the classroom, and when a teacher opened the door for him, the door accidentally hit Ricky in the head. (*Id.* at p. 1135.) Ricky "became

8

>    angry, cursed [the teacher] and threatened him, saying 'I'm going to get you.'" (*Ibid.*) The teacher reported that he "'felt threatened' and . . . ordered [Ricky] to report to the school office," but the incident was not reported to the police until the following day. (*Id.* at p. 1140.) The teacher properly sent Ricky to the principal's office after Ricky "uttered intemperate, disrespectful remarks to [his teacher] in the presence of a classroom full of students" where "this mouthing off or posturing was not designed to coerce [the teacher] to do or not to do anything," the teacher "admitted the threat was not specific" and there was no indication the teacher "felt fear beyond the time of the angry utterances." (*Ibid.*) On these facts, *Ricky T.* held the defendant's statement was "an emotional response to an accident rather than a death threat that induced sustained fear." (*Id.* at p. 1141.) Thus, held the court, "[a]lthough what [Ricky] did was wrong, we are hesitant to change this school confrontation between a student and a teacher to a terrorist threat. Students who misbehave should be taught a lesson, but not, as in this case, a penal one." (*Ibid.*)
>
>    Here, [Tanner] was in the midst of burglarizing the restaurant where Askari and Swing were working, before the restaurant was open, and was in the throes of a physical attack on Askari when the threats were made. [Tanner] threatened to kill Askari as he was smashing Askari's head into the ground. Askari testified he was scared and believed [Tanner] was going to kill him. There is conflicting testimony regarding whether Askari actually lost consciousness as a result of his head hitting the ground and whether he was conscious when officers arrived. Nonetheless, the evidence was that he was still scared, shaking, and visibly upset when officers arrived and until they subsequently handcuffed [Tanner]. Thus, whether Askari remained frightened after waking from unconsciousness or after he restrained [Tanner], his fear was "more than fleeting, momentary or transitory." (*Culbert*, *supra*, 218 Cal. App. 4th at p. 190.) Accordingly, we conclude substantial evidence supports the finding that Askari had "sustained fear" as a result of [Tanner's] criminal threats.

*Tanner*, 2015 WL 6468549, at *2-3.

To sustain a criminal threats conviction under California state law, "[t]he prosecution must prove '(1) that the defendant willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person,' (2) that the defendant made the threat 'with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out, (3) that the threat—which may be 'made verbally,' was 'on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate

9

prospect of execution of the threat,' (4) that the threat actually caused the person threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's safety," and (5) that the threatened person's fear was "reasonabl[e]" under the circumstances." *In re George T.*, 93 P.3d 1007, 1012 (Cal. 2004) (citing CAL. PEN. CODE § 422). As aforementioned, Tanner is only challenging here the sufficiency of the evidence with respect to the element of whether the victims were in a state of "sustained fear" for their safety. The word "sustained" in this context means "a period of time that extends beyond what is momentary, fleeting or transitory." *People v. Fierro*, 103 Cal. Rptr. 3d 858, 863 (Cal. Ct. App. 2010) (citing *People v. Allen*, 40 Cal. Rptr. 2d 7 (Cal. Ct. App. 1995)).

But the question of how long fear must last to sustain a conviction under Penal Code § 422 is governed solely by California law. This Court is bound by the state court's interpretation of California state law. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (per curiam) (a fundamental principle of our federal system is "that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus"). *Tanner* cites to no authority of the U.S. Supreme Court that contradicts this state court holding, and the Court is unaware of any. In the absence of any clearly established federal law on this issue, AEDPA relief is foreclosed. *See Carey*, 549 U.S. at 77. Ultimately, when viewing the evidence in the light most favorable to the prosecution and resolving all conflicts in the evidence in favor of the jury's verdict, a rational juror could have determined beyond a reasonable doubt that the prosecution presented evidence evincing that Askari was in sustained fear, as required to obtain Tanner's criminal threats conviction. Tanner is thus not entitled to relief on his legal insufficiency claim.

Ground 2.     Ineffective Assistance of Trial Counsel

Tanner additionally argues that trial counsel rendered ineffective assistance by failing to: 1) object to the court's limitation on questioning of a witness; 2) request the admission of a video clip; and 3) object to the prosecutor's closing argument. To demonstrate ineffective assistance of counsel under *Strickland v. Washington*, a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced his defense. 466 U.S. 668, 687 (1984). A deficient performance is one in which "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.*

The Supreme Court has explained that, if there is a reasonable probability that the outcome might have been different as a result of a legal error, the defendant has established prejudice and is entitled to relief. *Lafler v. Cooper*, 132 S. Ct. 1376, 1385-86 (2012); *Glover v. United States*, 531 U.S. 198, 203-04 (2001); *Williams*, 529 U.S. at 393-95. Where a habeas petition governed by AEDPA alleges ineffective assistance of counsel, the *Strickland* prejudice standard is applied and federal courts do not engage in a separate analysis applying the *Brecht* harmlessness standard. *Avila v. Galaza*, 297 F.3d 911, 918, n.7 (9th Cir. 2002); *see also Musalin v. Lamarque*, 555 F.3d 830, 834 (9th Cir. 2009). Under this rubric, in reviewing ineffective assistance of counsel claims in a federal habeas proceeding:

> The question "is not whether a federal court believes the state court's determination" under the *Strickland* standard "was incorrect but whether that determination was unreasonable—a substantially higher threshold." And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.

*Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (citations omitted); *see also Runningeagle v. Ryan*, 686 F.3d 758, 775 (9th Cir. 2012).

11

Thus, Tanner must show that his trial counsel's representation was not within the range of competence demanded of attorneys in criminal cases, and there is a reasonable probability that, but for counsel's ineffectiveness, the result would have been different. *See Hill v. Lockhart,* 474 U.S. 52, 57 (1985). An ineffective assistance of counsel claim should be denied if the petitioner fails to make a sufficient showing under either of the *Strickland* prongs. *See Strickland*, 466 U.S. at 697 (courts may consider either prong of the test first and need not address both prongs if the defendant fails on one).

Tanner first argues that counsel was ineffective for failing to object to the court's limitation on cross-examination. The record reflects that, during the cross-examination of a witness from a neighboring business, the trial court sustained the prosecutor's hearsay objections to defense counsel's questions, "Did you ever hear [Tanner] making threats to Mr. Askari?" and "Did you ever hear [Tanner] saying anything to Mr. Askari?" In considering Tanner's claim on direct appeal, the Court of Appeal agreed that the trial court's evidentiary ruling was incorrect because "'whether certain words were spoken . . . and not whether the words were true, evidence that these words were spoken . . . is admissible as nonhearsay evidence.'" *Tanner*, 2015 WL 6468549, at *3 (quoting *People v. Fields*, 72 Cal. Rptr. 2d 255, 258 (Cal. Ct. App. 1998)). It nonetheless concluded that Tanner was not prejudiced by counsel's inaction:

> [E]ven if the witness had been permitted to testify that he did not hear the threats, there is no reasonable probability that that evidence would have led to a different result. The timeline of events here establishes that Swing went next door to seek help while [Tanner] was still attacking Askari. An employee of the business followed Swing back to the restaurant immediately or almost immediately. However, the witness in question, a contractor, who was working at the neighboring business, paused before heading to the restaurant because he did not want to become involved. According to his testimony, when he arrived, Askari was on top of [Tanner], holding him down. By the time this witness arrived, neither Askari nor [Tanner] was hitting each other; they were both on the ground "at a standoff." The evidence showed that the threats were made while [Tanner]

was slamming Askari's head into the ground, before Swing returned and certainly before this witness arrived. Therefore, this witness's testimony that he did not hear the threat was not likely to result in a better outcome for [Tanner], so [Tanner] cannot prevail on his ineffective assistance of counsel claim.

*Tanner*, 2015 WL 6468549, at *4.

The Court of Appeal's resolution of this claim is both reasonable and fully supported by the record. Tanner therefore fails to show that he was prejudiced by counsel's failure to object,[2] and he is not entitled to relief on that ground.

Tanner next contends that counsel rendered ineffective assistance with respect to a video clip that showed Askari walking around within five minutes of the officers' arrival. The record reflects that defense counsel sought to admit the video clip "to undermine Askari's 'credibility as a witness in terms of testifying the nature and extent and severity of his injuries' and to disprove Askari's claim that he was 'unconscious for five minutes and couldn't get up.'" *Tanner*, 2015 WL 6468549, at *4. The trial court denied the request, finding it cumulative of other video clips and thus inadmissible under California Evidence Code § 352 because its probative value was outweighed by its likelihood to cause confusion or an undue consumption of time.[3] Tanner argued on direct appeal that the trial court erred when it excluded the clip. He also argued, as he

---

[2] Tanner may be arguing that the Court of Appeal erred by applying the *Strickland* standard for prejudice rather than the lower *Brecht* standard, which requires only a requisite effect or influence on the verdict. But even assuming, without deciding, that the Court of Appeal should have applied *Brecht*, Tanner would not be entitled to relief. As the Court of Appeal explained, the evidence showed that the testifying witness arrived on the scene after the threat had already been made. Accordingly, the court's limitation on questioning on that matter was inconsequential, and Tanner does not satisfy the *Brecht* standard either.

[3] Federal Rule of Evidence 403, the federal counterpart to California Evidence Code section 352, similarly permits the exclusion of evidence if its probative value is "substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

argues in the instant Petition, that trial counsel was ineffective for failing to seek admission of the video clip as evidence that Askari did not have sustained fear as a result of the threat.

The Court of Appeals rejected Askari's argument that counsel's treatment of the admission request was deficient, noting that the video clip recorded only "*after* officers had arrived, handcuffed [Tanner], and placed him in the rear seat of the patrol car." *Tanner*, 2015 WL 6468549, at *5. The appellate court reasoned:

> [E]ven if the video clip demonstrates that Askari's fear had dissipated once [Tanner] was secured in police custody, the probative value of that evidence to determining whether Askari had sustained fear is quite low. Furthermore, not only Askari, but the officers and other witnesses testified that Askari was scared when officers arrived on scene. So, rather than argue Askari was not afraid, trial counsel presented the rational argument that Askari never lost consciousness and that the threats were never made, as no one else heard the threats and witnesses testified Askari was conscious when they arrived. On these facts, we do not find trial counsel provided [Tanner] ineffective assistance.

*Id.*

The Court of Appeal's conclusion is again fully reasonable and supported by the record, thus also foreclosing relief here.

Finally, Tanner contends that counsel was ineffective for failing to object to the prosecutor's closing argument. The Court of Appeal considered and rejected this claim on direct appeal as follows:

> The prosecutor presented the following argument in closing: "Sustained fear means fear that—for a period of time that is more than momentary, fleeting, or transitory. We have that. But in this case, even if the sustained time is sufficient, just in the initial moment when he's being told 'I'll kill you' and loses consciousness, that's enough time. [¶] Okay. But . . . all the evidence shows when he re-alerted and realized what was coming [sic ] on and he became conscious again, he was still afraid, he was still shaking, he was very still vomiting, he was still a mess." Defense counsel did not object to this argument but, following the prosecutor's closing argument, the court and counsel had an off-the-record discussion in which defense counsel argued that the prosecutor's

14

arguments regarding the delay in time between the incident and the admitted video clip were improper.

A summary of this off-the-record discussion was not placed on the record until after the jury began deliberations. At that time, defense counsel then argued it was improper for the prosecutor to seek exclusion of the video clip showing Askari walking around within five minutes of the officers' arrival and then to argue to the jury that there was a lack of evidence that Askari was walking around "right away." The court asked what remedy defense counsel was seeking, and she stated at the time of the sidebar conference she wanted to request to reopen her case before presenting her closing argument but, because the court said the side-bar "was just going to be put on the record and there was—you said we would talk about it after the fact, . . . that remedy is out the window. That's the remedy I would have preferred." The court asked counsel, "You would have had your case reopened after the [prosecutor] had already started his closing arguments?" Counsel responded that she did not know what else she could do. The court advised that counsel could have made an objection or sought a curative admission during the prosecutor's argument.

Ultimately, the trial court found the prosecutor's statement was "entirely consistent" with the evidence. The trial court also recounted that when it excluded the video clip as cumulative, it was working on the assumption that the video clip could not be presented to the jury without the split screen also showing the irrelevant footage of [Tanner] being placed into the patrol car. It was only later that defense counsel presented the versions of the video clips without the split screen, and at that time defense counsel did not seek admission of the previously excluded clip. Thus, the trial court concluded that at that point, there was no remedy the trial court could afford, and nor would [Tanner] be entitled to one because there was no misrepresentation of the facts and no unfair argument.

In light of the trial court's ruling that there was no misrepresentation or unfair argument, it would appear that had defense counsel objected during the prosecutor's closing argument on that basis, such an objection would have been overruled by the trial court. Moreover, the prosecutor did not misstate the law by arguing that Askari felt sustained fear even if he was afraid only while the threats were being made and until he fell unconscious as a result of [Tanner] simultaneously slamming Askari's head into the ground. Therefore, defense counsel was not deficient in failing to raise the objection during the prosecutor's closing argument.

*Tanner*, 2015 WL 6468549, at *6 (citations omitted).

Tanner fares no better on federal habeas review. As the Court of Appeal's conclusion is again inherently reasonable and fully supported by the record, Tanner is not entitled to relief on this argument either. In sum, Tanner fails to establish that counsel was ineffective with respect to any argument advanced in support of this ground, and he is not entitled to relief.

15

V. CONCLUSION AND ORDER

Tanner is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability.  *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*, 537 U.S. at 327)).  Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit Court of Appeals.  *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: August 25, 2020.

        /s/James K. Singleton, Jr.
        JAMES K. SINGLETON, JR.
        Senior United States District Judge